UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JAMES TYRONE ELKINS, | ) | Civil Action No.: 4:20-cv-01369-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| -vs- | ) | **ORDER** |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security; | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned by voluntary consent pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for SSI on December 31, 2015, alleging inability to work since November 21, 2013. (Tr. 15). His claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a rehearing. A hearing was held on August 29, 2018, at which time Plaintiff and a vocational expert (VE) testified. The Administrative Law Judge (ALJ) issued an unfavorable decision on January 9, 2019, finding that Plaintiff was not disabled. (Tr. 15-33).

Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on February 5, 2020, making the ALJ's decision the Commissioner's final decision. (Tr. 1-4). Plaintiff filed this action on April 9, 2020. (ECF No. 1).

**B.     Plaintiff's Background and Medical History**

Plaintiff was born on February 28, 1979, and was thirty-six years old at the time the application was filed. (Tr. 31). Plaintiff alleges disability originally due to aneurysm, memory loss, headaches, epilepsy, and speech problems.[1] (Tr. 145-46). Pertinent medical records will be summarized under the relevant headings.

**C.     The ALJ's Decision**

In the decision of January 9, 2019, the ALJ made the following findings of fact and conclusions of law (Tr. 15-33):

1.     The claimant has not engaged in substantial gainful activity since December 31, 2015, the application date (20 CFR 416.971 *et seq*.).

2.     The claimant has the following severe impairments: epilepsy, status-post traumatic brain injury; neurocognitive disorder; personality disorder; anxiety disorder; a history of cerebral vascular accident; and degenerative disc disease (20 CFR 416.920(c)).

The claimant has the following non-severe impairments: hyperlipidemia and headaches.

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he can frequently balance; he can occasionally stoop, crouch, kneel, and crawl. The claimant should avoid moderate exposure to hazards; he should avoid concentrated exposure

---

[1] Plaintiff had previously filed for SSI, received an administratively final unfavorable decision in 2013, and did not appeal further. (Tr. 79-101).

to heat, cold, humidity, vibrations, and noise. The claimant can maintain concentration, persistence and pace for 2-hour periods for simple, routine, repetitive tasks and instructions; he can have occasional minimal interaction with the general public; he can have frequent interaction with co-workers.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on February 28, 1979 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since December 31, 2015, the date the application was filed (20 CFR 416.920(g)).

## II. DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the opinions of Dr. Bradberry and Dr. Neboschick and in determining the RFC. Defendants argue substantial evidence supports the ALJ's decision.

## A.      LEGAL FRAMEWORK

### 1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.  42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims).  An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity (SGA); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing past relevant work (PRW);[3] and (5) whether the impairment prevents him from doing SGA.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not

----

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do.  The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

4

disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

5

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## B.    ANALYSIS

### 1.    Dr. Bradberry's Opinions

Plaintiff argues the ALJ did not explain what weight was given to Dr. Bradberry's medical opinion regarding Plaintiff's ability to do work-related physical activities,[4] nor did the ALJ apply the factors set by regulation for assessing a treating opinion. Defendant disagrees, arguing that "[t]he ALJ . . . evaluated Dr. Bradberry's opinions in accordance with the regulations and provided legally sound reasons, supported by the record, for the weight she gave them." (ECF No. 14 at 11). The appropriate analysis is whether substantial evidence supports the ALJ's assignment of weight to Dr.

---

[4] Dr. Bradberry also provided an opinion regarding Plaintiff's mental abilities by way of a mental status questionnaire. (Tr. 477). However, because Plaintiff focuses on the ALJ's treatment of Dr. Bradberry's medical opinion regarding Plaintiff's work-related physical abilities, the discussion here will largely focus on that opinion.

6

Bradberry's opinion and whether the proper legal standard was applied.

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. *See* 20 C.F.R. § 404.1527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ applies the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. *See* SSR 96-2p; *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). The ALJ considers the evidence in the record as a whole

7

when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

Even when a treating opinion is not entitled to controlling weight, "it does not follow that the ALJ ha[s] free reign to attach whatever weight to that opinion that he deem[s] fit." *Dowling v. Comm'r of Soc. Sec. Admin.*, 2021 WL 203371, at *5 (4th Cir. Jan. 21, 2021) (published). It must be "apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Id.* at *5. The Fourth Circuit Court of Appeals found where only the factors of supportability and consistency were discussed by the ALJ and other factors of length, frequency, nature, and extent of treating relationship were ignored, it was error necessitating remand. *Id.* at *5. "20 C.F.R. § 404.1527(c) requires ALJs to consider *all* of the enumerated factors in deciding what weight to give a medical opinion." *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 107 n.16 (4th Cir. 2020) (emphasis in original).

On August 9, 2018, Dr. Bradberry filled out a form opining that Plaintiff could lift and carry less that ten pounds on an occasional and frequent basis. (Tr. 746). According to Dr. Bradberry, Plaintiff could stand/walk for less than two hours a day, and similarly, he could sit for less than two hours a day during an eight-hour day. (Tr. 746). Dr. Bradberry opined that Plaintiff could sit or stand for 30 minute intervals before changing position, and Plaintiff needed to walk around every 15 minutes for about 15 minutes. (Tr. 747). Dr. Bradberry opined that Plaintiff would need to lie down at unpredictable intervals "every hour" during a work shift. (Tr. 747). Dr. Bradberry indicated that Plaintiff's limitations were due to his "seizure disorder refractory to therapy[.]" (Tr. 747). Dr. Bradberry opined that Plaintiff could occasionally twist, stoop (bend), crouch, climb stairs, and climb ladders. (Tr. 747). Plaintiff's fine manipulation skills were affected by his impairment. (Tr. 747).

8

Dr. Bradberry indicated that Plaintiff had to avoid all exposure to extreme heat, noise, fumes, odors, gases, poor ventilation, and hazards (such as machinery and heights). (Tr. 748). Plaintiff also needed to avoid even moderate exposure to extreme cold, wetness, and humidity. (Tr. 748). Dr. Bradberry anticipated that Plaintiff's impairments and treatment would cause him to be absent from work more than three times a month. (Tr. 748).

The ALJ examined and weighed the opinion by Dr. Phillips:

Dr. Bradbury, M.D., Ph.D., of Newberry Internal Medicine, the claimant's treating physician, then completed a Medical Opinion, Physical, on August 9, 2018 (Exhibit B20F). Dr. Bradbury opined that the claimant could lift and carry less than 10 pounds, occasionally and frequently; he could walk, sit, and stand, for less than 2-hours each. He could sit for 30 minutes; he could stand for 30 minutes; he needed to walk around every 15 minutes for 15 minutes each time. He needed to lie down every hour through the day due to his seizure disorder refractory to therapy. He could occasionally twist, stoop, crouch, climb stairs, and climb ladders. Fine manipulation was affected. He should avoid even moderate exposure to extreme cold, wetness, and humidity. He should avoid all exposure to extreme heat, noise, fumes, and hazards. The claimant would also be absent more than three times a month (Exhibit B20F). **I give some weight to this opinion, as it is more consistent with the records**. However, I note that Dr. Bradbury's records note the claimant needed to get out of the house and exercise, versus the statements herein that state the claimant needed to lie down throughout the day.

(Tr. 31) (emphasis added).

The following are summarized contemporaneous treatment notes of Dr. Bradberry.

On September 25, 2014, Plaintiff was seen by Dr. Bradberry at the Free Medical Clinic of Newberry.[5] (Tr. 450). Notes from that visit indicate that Plaintiff had two seizures since his last visit. (Tr. 450). Dr. Bradberry's handwritten notes indicate that Plaintiff was on Dilantin for seizures, and the dose needed to be adjusted. (Tr. 450).

---

[5] According the medical records, Plaintiff initially went to the Free Medical Clinic of Newberry in early 2014 after being seen in the emergency room for seizures. (Tr. 457). Plaintiff was seen by a different doctor prior to Dr. Bradberry. (Tr. 451-57).

9

On October 9, 2014, Plaintiff was seen by Dr. Bradberry. (Tr. 471). Dr. Bradberry noted that Plaintiff's Dilantin dose had been increased.[6] (Tr. 471). Plaintiff was to return in four weeks. (Tr. 471).

In a follow up appointment on November 6, 2014, Dr. Bradberry wanted Plaintiff to apply for Keppra, if possible. (Tr. 470). Dr. Bradberry also wrote, "exam okay" regarding the visit. (Tr. 470).

On January 22, 2015, Plaintiff was seen by Dr. Bradberry and reported he had had two seizures recently, one in November and one in early January. (Tr. 468). Dr. Bradberry indicated the seizures were "probably precipitated by sulfa drug." (Tr. 468).

On February 26, 2015, Plaintiff followed up with Dr. Bradberry at the Free Medical Clinic. (Tr. 481). Dr. Bradberry increased Plaintiff's Dilantin dosage to 600 mg with an instruction to have Plaintiff's Dilantin levels rechecked. (Tr. 481).

On March 12, 2015, Dr. Bradberry saw Plaintiff and started him on Keppra and Fluoxetine. (Tr. 480). Dr. Bradberry discontinued Plaintiff's Dilantin. (Tr. 480). According to Dr. Bradberry's notes, Plaintiff's exam was benign. Plaintiff was instructed to return in one month. (Tr. 480). Dr. Bradberry further noted that he completed a disability form for Plaintiff. (Tr. 480).

In the mental status questionnaire that Dr. Bradberry filled out on March 12, 2015, Dr. Bradberry opined that Plaintiff had been diagnosed with a cerebral aneurysm with resulting seizures. (Tr. 477). Plaintiff had been prescribed Dilantin and Keppra, which had helped his condition. (Tr.

---

[6] Within the medical records from the Free Medical Clinic of Newberry, there are some lab results for Plaintiff's Dilantin levels with handwritten notes by Dr. Bradberry. On one test result, from October 2, 2014, Dr. Bradberry noted that the dosage should be increased to 500 mg/day and then checked in a week. (Tr. 475). On another test result, from October 9, 2014, Dr. Bradberry noted "okay" and continued Plaintiff on five pills daily. (Tr. 474).

477).  Dr. Bradberry had not recommended psychiatric care.  (Tr. 477).  According to Dr. Bradberry,

Plaintiff was oriented to time, person, place, and situation.  (Tr. 477).  Dr. Bradberry further opined

that Plaintiff had slowed thought processes, suspicious thought content, depressed mood/affect, poor

attention/concentration, and poor memory.  (Tr. 477).  Dr. Bradberry opined Plaintiff had good

ability to: complete basic activities of living, relate to others, and complete simple, routine tasks.

(Tr. 477).  Plaintiff had adequate ability to complete complex tasks.  (Tr. 477).  Plaintiff was not able

to manage his own funds.  (Tr. 477).

On April 30, 2015, Dr. Bradberry saw Plaintiff at the Free Medical Clinic of Newberry.  (Tr.

592).  Dr. Bradberry noted that Plaintiff had seized while driving.  (Tr. 592).  Dr. Bradberry

increased Plaintiff's Keppra dosage to 1000 twice daily and noted that Plaintiff was only on Keppra.

(Tr. 592).  Dr. Bradberry also noted "seeking disability statement[.]" (Tr. 592).

On May 28, 2015, Dr. Bradberry's notes indicate that Plaintiff had seized while at Baptist

Parkridge.[7]  (Tr. 591).  Plaintiff was on Keppra 1000 twice daily, was seeing another doctor at

---

[7] The notes from Plaintiff's visit to the Baptist Parkridge Emergency Room show that
Plaintiff's wife took him to the ER following a number of seizures that occurred on May 25,
2015.  (Tr. 511-18).  Earlier the same day, Plaintiff had gone to the Newberry ER with a
temperature and seizures, and he was given an antibiotic.  (Tr. 511).  Plaintiff was post-ictal at
the time of visit to Baptist Parkridge, and he seized twice in the ER and was given Ativan.  (Tr.
511-12).  The notes indicate that there were no significant findings in the physical exam but
Plaintiff did bite his tongue during a seizure in the ER.  (Tr. 512).  Plaintiff was given multiple
CT scans "[g]iven his repeated seizures, and . . . he ha[d] not returned back to the baseline which
[was] consider[ed] a prolonged postictal phase . . . ." (Tr. 512).  Plaintiff was then transferred to
a "stepdown unit" at Palmetto Health Richland, and he was discharged on May 27, 2015.  (Tr.
504-06, 512-13).
        While at Palmetto Health Richland, Plaintiff had a consult with USC Neurology.  The
exam from the consultation showed: Plaintiff's visual fields were full.  He had intact smooth
pursuit, no nystagmus, no ptosis.  Plaintiff's facial sensation was intact bilaterally.  He had 5/5
jaw strength.  Plaintiff's nasolabial fold and smile were symmetrical.  Eyebrow raise and 5/5 eye
closure were symmetrical.  Plaintiff's hearing was symmetrical & normal to rubbing fingers.  His
palate elevated symetrically.  Head turning and shoulder shrug were intact and symmetric

Richland, had refractory seizures, and reportedly had an elevated white blood count. (Tr. 591).

In a follow up appointment on July 30, 2015, after Plaintiff had been hospitalized for his seizures, Dr. Bradberry noted that Plaintiff was taking Keppra and Tegretol. (Tr. 590). Dr. Bradberry also noted that he gave Plaintiff a statement indicating that Plaintiff could not work due to refractory seizures. (Tr. 590).

On August 20, 2015, Plaintiff was seen by Dr. Bradberry. (Tr. 589). Dr. Bradberry noted Plaintiff was on both Tegretol and Keppra and that Plaintiff's seizures were improved. (Tr. 589).

On December 10, 2015, Plaintiff was seen by Dr. Bradberry. (Tr. 588). Within the notes for that visit, Dr. Bradberry indicated Plaintiff was being seen by the USC Specialty Clinic and Plaintiff had a "seizure due to missing dose + forgetful[.]" (Tr. 588). Dr. Bradberry further noted that antibiotics lower the seizure threshold. (Tr. 588). Dr. Bradberry wrote, "Assess 1) seizure disorder[.]" (Tr. 588).

On March 17, 2016, Plaintiff had an appointment with Dr. Bradberry. (Tr. 625). Dr. Bradberry noted Plaintiff's brain aneurysm leading to seizures. (Tr. 625). Dr. Bradberry listed Plaintiff's medications as Keppra (1000 mg twice daily), Tegretol (200 mg twice daily), and Lorazepam (0.5 mg twice daily). (Tr. 625). Dr. Bradberry assessed refractory seizures and noted Plaintiff was followed by USC Neurology. (Tr. 625).

---

bilaterally. Plaintiff's tongue protrusion was midline. Plaintiff had no pronator drift. His muscle bulk was normal with no significant atrophy. He had normal tone. There was no spasticity or rigidity appreciated. Plaintiff's sensation was intact to light touch in all four extremities. There was no tremor noted, no dysmetria, and, on finger-to-nose, no abnormal or extraneous movements. Plaintiff's gait was ambulatory. (Tr. 502). Dr. Amar Anand, who performed the consultation, noted that there were likely multiple factors related to Plaintiff's breakthrough seizures, including Plaintiff's upper respiratory tract infection and ingestion of ampicillin and that he had consumed alcohol on the previous day, which historically had precipitated his seizures. (Tr. 502).

On May 18, 2016, Plaintiff visited Dr. Bradberry at Newberry Internal Medicine to establish himself as a patient. (Tr. 620). Dr. Bradberry wrote the following notes about Plaintiff:

> He has a [sic] free clinic patient of mine whom I know well. He has a history of refractory seizures and has been to multiple locales for treatment. Ultimately he has been controlled on tegretol and keppra with lorazepam available for breakthroughs. He has a history of traumatic head injury with surgical intervention. This resulted in his seizure disorder. Reportedly heat triggers his epileptic events. He is disabled in the sense that he cannot work in hot conditions.
>
> Otherwise he appears to be a healthy not obese male.

(Tr. 620). Dr. Bradberry noted that sulfur drugs elicited seizures for Plaintiff. (Tr. 620). Plaintiff was to follow up in three months. (Tr. 621).

On August 19, 2016, Plaintiff was seen by Dr. Bradberry at Newberry Internal Medicine. (Tr. 751). Dr. Bradberry noted that Plaintiff had a seizure secondary to medical noncompliance but the oversight was inadvertent. (Tr. 751). Dr. Bradberry counseled Plaintiff with regard to hyperlipidemia and seizure treatment. (Tr. 751). Dr. Bradberry also encouraged Plaintiff to take Ativan during a seizure and counseled Plaintiff's wife on how to help Plaintiff during a seizure. (Tr. 751).

On October 5, 2016, Plaintiff was admitted to Newberry County Memorial Hospital following a seizure. (Tr. 664-69). According to the admission notes, Plaintiff had seized at home and had hit his head. (Tr. 666). The seizure had lasted minutes, and Plaintiff lost consciousness during the seizure. (Tr. 666). The physical exam upon admission showed Plaintiff was post-ictal but alert and not in acute distress. (Tr. 667). His pupils were equal, round, and reactive to light. (Tr. 667). Examination of his ears, nose, and throat, his neck, his cardiovascular system, and his respiratory system were all normal. (Tr. 667). Plaintiff's extremities showed normal range of

13

movement.  (Tr. 667).  Plaintiff's mood and affect and speech were all normal.  (Tr. 667).  While

undergoing a CT scan, Plaintiff seized and was given Ativan.  (Tr. 672).  Dr. Bradberry was

consulted about Plaintiff's treatment during his hospital stay.  (Tr. 669).  Dr. Bradberry summarized

Plaintiff's hospital visit as follows:

> The patient's seizures were controlled in the emergency room with high doses of
> lorazepam.  He was transferred to the intensive care unit.  Crystalloid was infused
> and Keppra was administered intravenously.  His sensorium gradually cleared up at
> post ictal state.  He could swallow his medications and they were administered in
> accordance with his regimen.  On the morning of hospitalization day #3 he was
> reasonably clear and ambulating in the hallway.  All seizures have resolved and he
> was discharged home on his regular medications.

(Tr. 694).  Thus, Plaintiff was discharged from the hospital on October 7, 2016, with instructions to

follow up with Dr. Bradberry in a week.  (Tr. 694).

On October 14, 2016, Plaintiff was seen by Dr. Bradberry.  (Tr. 753).  Dr. Bradberry's notes

state:

> He seized extensively.  He had not really been taking his Keppra and his Tegretol.
> He ended up in the hospital.  His post ictal period was very prolonged.  I lectured him
> extensively on compliance with his medicine in the setting of traumatic injury to the
> skull leading to a seizure source in the brain.  Other than that he is at baseline.  I
> warned him that repeated seizures would lead to mentation changes in the long run.

(Tr. 753).

On February 20, 2017, Plaintiff had a check up with Dr. Bradberry.  (Tr. 755). Plaintiff had

been seizure-free and had been taking his medications as directed.  (Tr. 755).  Dr. Bradberry noted

that Plaintiff's Tegretol dosage had been increased after meeting with the neurologist, and a lipid

panel was pending.  (Tr. 755).  Dr. Bradberry wrote: "He needs to be more physically active and lose

weight."  (Tr. 755).

On June 21, 2017, Plaintiff saw Dr. Bradberry.  (Tr. 757).  Dr. Bradberry indicated that

14

Plaintiff had been seizure free for several months and had been taking his medication.  (Tr. 757).

Dr. Bradberry indicated that Plaintiff's lipids were high, which was unfavorable.  (Tr. 757).  Dr.

Bradberry noted, "He is gaining weight and I counseled exercise and diet."  (Tr. 757).

On March 21, 2018, Plaintiff had a check up with Dr. Bradberry.  (Tr. 760).  Dr. Bradberry

noted that Plaintiff had not had a seizure since January, and his regimen of Tegretol and Keppra was

working.  (Tr. 760).  Dr. Bradberry noted that Plaintiff needed to lose weight and diagnosed him with

obesity.  (Tr. 760-61).  Dr. Bradberry further indicated that he had provided a statement regarding

Plaintiff's disability and recurrent seizures.  (Tr. 760).

On July 27, 2018, Plaintiff had a check up with Dr. Bradberry.  (Tr. 764).  Dr. Bradberry's

notes from the appointment are as follows:

> Neurologically he is somewhat diminished in terms of his balance and his stamina
> and his motor control.  He cannot stand on one-leg[], he can tandem walk AQND
> finger-to-nose is deliberate but slower than one would expect.  Pronation, supination
> of the hands is okay.  An MRI will be performed.  The last one was 5 years ago and
> demonstrated an aneurysmal clip as well as encephalomalacia.  All that is driving his
> epilepsy which is controlled with Tegretol and Keppra.  He has not had another
> seizure lately.  He has sworn off alcohol secondary to its inciting seizures.  He, now,
> gets quite agitated.  I think we will try Lexapro 10 mg daily to see if it will calm his
> nerves.  His lipid profile was unfavorable and he will need treatment in the future if
> not soon.  He denies fever, chills, nausea, vomiting or chest pain.
>
> He does continue to smoke cigarettes, he is not falling think he is not clinically
> depressed but I think he is somewhat internally agitated and quick to lose his temper.

(Tr. 764).  Dr. Bradberry noted that he had encouraged diet and exercise but Plaintiff "has exercise

limitations based on his coordination based on his stroke based on his encephalomalacia . . . ."  (Tr.

764-65).

The ALJ gave "some weight" to all of Dr. Bradberry's opinion, finding it was "more

consistent with the records."[8] (Tr. 31). However, the ALJ did not provide any explanation as to any specific functional limitations that were opined and only commented on the need to lie down: "Dr. Bradberry's records note the claimant needed to get out of the house and exercise, versus the statements herein that state the claimant needed to lie down throughout the day." (Tr. 31). Even assuming there is adequate support for the ALJ's exclusion of that limitation,[9] there are other limitations from Dr. Bradberry's opinion that the ALJ did not include in the RFC or otherwise explain or analyze despite those limitations having been given some weight—for example, that Plaintiff could stand and walk for less than two hours and could sit for less than two hours during a normal work day. Indeed, the RFC does not account for any of Dr. Bradberry's opined limitations in sitting, standing, walking, or position changes, which the ALJ already found were entitled to some weight as they were more consistent with the record.[10] (*See* Tr. 23).

---

[8] It is not altogether clear what comparison is being drawn by saying Dr. Bradberry's opinion is "more consistent with the records." (Tr. 31). Presumably, the ALJ meant that Dr. Bradberry's opinion with regards to Plaintiff's work-related physical limitations was "more consistent" with the records than the ALJ deemed Dr. Bradberry's opinion with regards to Plaintiff's work-related mental limitations, as she had given "little weight" to the opinions Dr. Bradberry offered in the mental status questionnaire from March 12, 2015, based on a finding that "it is not consistent with Dr. Bradbury's [sic] own records showing the claimant has intact memory, concentration, and attention." (Tr. 30). However, it is possible that the ALJ believed Dr. Bradberry's opinion as to Plaintiff's physical limitations was "more consistent" with the medical records than the opinions offered by other non-treating physicians.

[9] Dr. Bradberry's opinion that Plaintiff would need to lie down at unpredictable intervals as often as every hour is not necessarily inconsistent with his counseling Plaintiff to exercise and lose weight. The two are not necessarily mutually exclusive.

[10] Defendant argues that "[s]ubstantial evidence supports the ALJ finding here, where none of Dr. Bradberry's treatment records showed that he limited Plaintiff's functioning in any way; but do show that he advised Plaintiff to 'be more physically active' (Tr. 755)." (ECF No. 14 at 12). It is true that Dr. Bradberry counseled Plaintiff to lose weight on multiple occasions. (Tr. 755-56 (February 20, 2017), 757-58 (June 21, 2017), 760-61 (March 21, 2018), 764-65 (July 27, 2018)). But on July 27, 2018, Dr. Bradberry also noted Plaintiff's inherent "exercise

16

Further, while the ALJ acknowledged that Dr. Bradberry was Plaintiff's treating physician and did not give Dr. Bradberry's opinion controlling weight, she also did not discuss the length of treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship,[11] 20 C.F.R. § 404.1527(c)(2) factors, when weighing Dr. Bradberry's opined limitations as required. *See Dowling v. Comm'r of Soc. Sec. Admin.*, 2021 WL 203371, at *5 (4th Cir. Jan. 21, 2021) (published); *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 107 n.16 (4th Cir. 2020).

Resolving conflicting evidence with reasonable explanation is an exercise that falls within the ALJ's responsibility and is outside the court's scope of review. *See Mascio v. Colvin*, 780 F.3d 632, 637-40 (4th Cir. 2015). The ALJ did not clearly explain why she deemed Dr. Bradberry's opinion as to Plaintiff's work-related physical limitations entitled to less than controlling weight, nor did the ALJ properly evaluate the 20 C.F.R. § 404.1527(c) factors in relation to the evidence in the record and Dr. Bradberry's opinions. It is not the court's "role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox v. Colvin*, 632 Fed. Appx. 750, 755 (4th Cir. Dec. 17, 2015). "The ALJ's failure to 'build an accurate and logical bridge from the evidence to his conclusion' constitutes reversible

---

limitations based on his coordination based on his stroke based on his encephalomalacia . . . ." (Tr. 764-65).

[11] Some of Plaintiff's visits to Dr. Bradberry are included within the medical history outlined the ALJ's decision. For example, the ALJ referenced Plaintiff's visits with Dr. Bradberry at the Free Medical Clinic of Newberry on March 12, 2015, and at Newberry Internal Medicine on October 15, 2016; February 20 and June 21, 2017; and March 21, and July 27, 2018. (Tr. 24-27). The ALJ also included Plaintiff's October 2016 visit to the hospital, where Dr. Bradberry consulted on his care. (Tr. 26). However, there is no indication that the ALJ considered either how long Dr. Bradberry had been treating Plaintiff for seizures or how frequent Dr. Bradberry saw Plaintiff for the condition, which are enumerated 20 C.F.R. § 404.1527(c)(2) factors.

17

error." *Lewis v. Berryhill*,858 F.3d 858, 868 (4th Cir. 2017) (internal citations omitted). Based on the foregoing, the court cannot find that the ALJ's decision regarding the evaluation of Dr. Bradberry's opinions is supported by substantial evidence, and remand is appropriate.

### 2.     Dr. Neboschick's Opinions

The ALJ considered the opinions of non-examining state agency consultants as a group. (Tr. 31). Plaintiff argues the ALJ did not properly discuss and explain the weight given to one of the non-examining consultant's opinions— Dr. Michael Neboschick. Defendant acknowledges the ALJ could have more clearly discussed the opinions of the non-examining consultants had she discussed them separately, but ultimately, Defendant contends that the ALJ properly evaluated Dr. Neboschick's opinion in accordance with the regulations.

In April 2016, Dr. Neboschick found that Plaintiff had mild restriction of activities of daily living and moderate difficulties in both maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 150). Dr. Neboschick summarized the evidence he considered and found that the "[s]everity of [Plaintiff's] stated limitations [were] only partially consistent w[ith] the evidence in file and would not preclude the performance of simple, unskilled work in more isolated settings." (Tr. 151). In the mental residual functional capacity (MRFC) assessment, Dr. Neboschick found that Plaintiff had limitations with sustained concentration and persistence and was moderately limited in his ability to carry out detailed instructions. (Tr. 155-56). Dr. Neboschick further opined that Plaintiff had social interaction limitations, including moderate limitations in the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 156). Dr.

Neboschick explained as follows:

> The claimant is able to understand and carry out simple routine tasks. The claimant can persist at simple tasks for at least two hour periods with the usual breaks. The claimant does not require special supervision to complete tasks. The claimant may miss a day or two due to his psych sxs, but should generally be able to complete a normal work week. The claimant would do best at **structured, slow paced jobs** in more isolated settings that do not involve much interaction. The claimant can avoid hazards and adhere to normal standards of safety and hygiene.

(Tr. 157) (emphasis added).

> The ALJ considered the opinions of the state agency consulting experts collectively:

> Social Security Ruling 96-9p indicates that I must look to the State Agency determinations before making a decision. Disability Determination Service's assessments are given **little weight** (Exhibits B3A, B6A, B9A, and B12A). Disability Determination Services was not a treating source and did not examine the client. After a thorough review of the record, and having had the benefit of observation of the claimant's demeanor and his testimony, **I have determined the claimant to have greater limitations.**

(Tr. 31) (emphasis added).

Prior to Dr. Neboschick's review, Dr. Silvie Kendall assessed Plaintiff's mental limitations in December 2014 and found that Plaintiff had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 110). In the MRFC, Dr. Kendall found that Plaintiff had moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining attention and concentration for extended periods. (Tr. 115). Dr. Kendall further opined that Plaintiff had moderate limitations in the ability to interact appropriately with the general public but found no significant limitations in Plaintiff's ability to interact with either coworkers or supervisors. (Tr. 116). Dr. Kendall labeled Plaintiff's impairments "severe" but found they "would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." (Tr. 116).

19

In March 2015, Dr. Craig Horn found Plaintiff had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 131). In the MRFC, Dr. Horn opined that Plaintiff had limitations in understanding and memory and in sustained concentration and persistence, including moderate limitations in the ability to understand, remember, and carry out detailed instructions and the ability to maintain attention and concentration for extended periods. (Tr. 138). Dr. Horn further opined that Plaintiff had social interaction limitations, including moderate limitations in the ability to interact appropriately with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 139). Dr. Horn concluded, "Overall, claimant's symptoms and impairments are severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interacting with the public." (Tr. 139).

In July 2016, Dr. Debra C. Price evaluated Plaintiff and found similar limitations to those identified by the other consulting psychologists who had evaluated Plaintiff. (Tr. 167-68). She opined that Plaintiff had moderate difficulties in both maintaining social functioning and maintaining concentration persistence or pace. (Tr. 167). Dr. Price opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions and in the ability to carry out detailed instructions. (Tr. 173). Dr. Price further opined that Plaintiff was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 173). As to social interactions, Dr. Price opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public, his ability to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with coworkers or

20

peers without distracting them or exhibiting behavioral extremes. (Tr. 174). Dr. Price adopted Dr. Neboschick's explanation as to the tasks that Plaintiff could complete and what types of jobs would be appropriate for him. (Tr. 174).

In addition to the above mental health experts, there were also other state agency physicians who reviewed Plaintiff's physical limitations. (Tr. 112-15 (Dr. William Hopkins), 135-37 (Dr. Dina Nabors), 152-55 (Dr. Nabors), 169-72 (Dr. Carl Anderson)).

Initially, Plaintiff argues that "the ALJ's combined discussion of all of the consultative examiner's opinions as one opinion is cause for confusion." (ECF No. 13 at 20). Defendant also admits that "a separate discussion of each opinion would have been more clear, [but] a review of the ALJ's decision as a whole makes readily apparent that her finding of 'greater limitations' refers to Plaintiff's exertional capacity." (ECF No. 14 at 14). The above review of the opinions from four non-examining consultants demonstrates that, while similar, the opinions by those experts as to Plaintiff's mental limitations were not identical. Yet, the ALJ dismissed those opinions (and others) wholesale because she found Plaintiff to have "greater limitations" than those opined by the consultants. More problematically, it is not accurate that all of the limitations included in the RFC were *greater* than those described by Dr. Neboschick (and some of the other mental health consultants). For example, the RFC limitation that Plaintiff could perform simple, routine, repetitive tasks is not *greater* than Dr. Neboschick's opined limitation of structured, slow paced jobs. (*Cf.* Tr. 23 & 157). Likewise, the RFC limitation on Plaintiff's social interaction—that is, occasional minimal interaction with the general public and frequent interaction with co-workers—is not necessarily greater than Dr. Neboschick's opined limitation that Plaintiff work "in more isolated

21

settings that do not involve much interaction."[12]   (*Cf.* Tr. 23 & 157).   Thus, the ALJ created an internal inconsistency.   In an attempt to remedy this problem, Defendant offers the post-hoc rationalization[13] that the ALJ was referring only to Plaintiff's exertional capacity when she found "greater limitations[,]" (ECF No. 14 at 14), but it is improper for the court to consider Defendant's post-hoc rationalization.

The ALJ is obligated to consider all evidence, not just that which is helpful to her decision. *Gordon v. Schweiker*, 725 F.2d 231, 235-36 (4th Cir. 1984); *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987).   Resolving conflicting evidence with reasonable explanation is an exercise that falls within the ALJ's responsibility and is outside the court's scope of review.   *See Mascio v. Colvin*, 780 F.3d 632, 637-40 (4th Cir. 2015).   Remand is appropriate because the court is "left to guess" how the ALJ assigned little weight to Dr. Neboschick with only the explanation that the RFC contained greater limitations, where the RFC did not necessarily contain greater limitations than Dr. Neboschick's opined limitations in regard to the type of pace of work Plaintiff was capable of and in regard to interaction with others. *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015) ("[W]e agree with the Second Circuit that '[r]emand may be appropriate . . . where other inadequacies in the

---

[12] *See, e.g.*, *Duran v. Berryhill*, No. 18-cv-0734 SMV, 2019 WL 1992103, at *4 (D.N.M. May 6, 2019) (concluding that a limitation to "frequent interactions with supervisors" failed to account for medical opinions that assessed a "moderate" limitation in interacting with supervisors).

[13] Defendant's post-hoc rationalization with respect to this issue cannot be considered by the Court.   *See Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Steel v. Barnhart*, 290 F.3d 936 (7th Cir. 2002) ("But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.")

ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam))).

Based on the foregoing, the court cannot find that the ALJ's decision regarding the evaluations of Dr. Bradberry's and Dr. Neboschick's opinions are supported by substantial evidence, and such errors impact the RFC determination; remand is appropriate. Upon remand, the Commissioner should address all of Plaintiff's remaining issues, including but not limited to Plaintiff's additional arguments regarding the RFC determination. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## III. CONCLUSION

The court is constrained by its limited function under 42 U.S.C. § 405(g). Our function is to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). As discussed above, the ALJ's decision is not based on substantial evidence.[14]

"We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235–36 (4th Cir. 1984)(citing *Myers v. Califano*, 611 F.2d 980, 983

---

[14] Remand, rather than reversal, is required when the ALJ fails to explain her reasoning and there is ambivalence in the medical record, precluding a court from "meaningful review." *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir.2013).

(4th Cir.1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir.1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.1977)). "The ALJ is not required to discuss every piece of evidence, but if he does not mention material evidence, the court cannot say h[er] determination was supported by substantial evidence." *Seabolt v. Barnhart*, 481 F. Supp. 2d 538, 548 (D.S.C. 2007)(citing *Arnold v. Sec'y*, 567 F.2d 258, 259 (4th Cir.1977) ("The courts ... face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty....")). Due to the errors in the ALJ's decision, it is appropriate to remand to the Commissioner for further action.

It may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and this case is REMANDED to the Commissioner for further administrative action as set forth above.

                                                   s/Thomas E. Rogers, III
May 11, 2021                                Thomas E. Rogers, III
Florence, South Carolina            United States Magistrate Judge